IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

CHARLOTTE GLOVER,

    Plaintiff,                    No. CIV S-04-2288 GGH

    vs.

JO ANNE B. BARNHART,         ORDER
Commissioner of
Social Security,

    Defendant.
_____/

       Plaintiff, proceeding in pro se, seeks judicial review of a final decision of the Commissioner of Social Security ("Commissioner") denying her applications for Supplemental Security Income ("SSI") under Title XVI and Disability Insurance Benefits ("DIB") under Title II of the Social Security Act ("Act"). For the reasons that follow, plaintiff's Motion for Summary Judgment is DENIED, the Commissioner's Cross Motion for Summary Judgment is GRANTED, and the Clerk is directed to enter judgment for the Commissioner.

BACKGROUND

       Plaintiff, born October 3, 1969, applied on May 24, 2002 for disability benefits. (Tr. at 40, 166, 13.) Plaintiff alleged she was unable to work since November 1, 2001 due to deterioration of the spine. (Tr. at 40, 47.)

\\\\\

1

In a decision dated May 13, 2004,[1] ALJ F. Lamont Liggett determined plaintiff was not disabled. The ALJ made the following findings:[2]

    1.    The claimant meets the nondisability requirements for a period of disability and Disability Insurance Benefits set forth in Section 216(i) of the Social Security Act and is insured for benefits through the date of this decision.

    2.    The claimant has not engaged in substantial gainful activity since the alleged onset of disability.

    3.    The claimant's impairments are considered "severe" based on the requirements in the Regulations 20 CFR §§ 404.1520(c) and 416.920(b).

    4.    These medically determinable impairments do not meet or medically equal one of the listed impairments in Appendix

---

[1] Plaintiff had previously applied for disability in 1999, but was denied in 2001. (Tr. at 49-50.)

[2] Disability Insurance Benefits are paid to disabled persons who have contributed to the Social Security program, 42 U.S.C. § 401 et seq. Supplemental Security Income is paid to disabled persons with low income. 42 U.S.C. § 1382 et seq. Both provisions define disability, in part, as an "inability to engage in any substantial gainful activity" due to "a medically determinable physical or mental impairment. . . ." 42 U.S.C. §§ 423(d)(1)(a) & 1382c(a)(3)(A). A parallel five-step sequential evaluation governs eligibility for benefits under both programs. See 20 C.F.R. §§ 404.1520, 404.1571-76, 416.920 & 416.971-76; Bowen v. Yuckert, 482 U.S. 137, 140-142, 107 S. Ct. 2287 (1987). The following summarizes the sequential evaluation:

    Step one: Is the claimant engaging in substantial gainful activity? If so, the claimant is found not disabled. If not, proceed to step two.
    Step two: Does the claimant have a "severe" impairment? If so, proceed to step three. If not, then a finding of not disabled is appropriate.
    Step three: Does the claimant's impairment or combination of impairments meet or equal an impairment listed in 20 C.F.R., Pt. 404, Subpt. P, App.1? If so, the claimant is automatically determined disabled. If not, proceed to step four.
    Step four: Is the claimant capable of performing his past work? If so, the claimant is not disabled. If not, proceed to step five.
    Step five: Does the claimant have the residual functional capacity to perform any other work? If so, the claimant is not disabled. If not, the claimant is disabled.

Lester v. Chater, 81 F.3d 821, 828 n.5 (9th Cir. 1995).
    The claimant bears the burden of proof in the first four steps of the sequential evaluation process. Bowen, 482 U.S. at 146 n.5, 107 S. Ct. at 2294 n.5. The Commissioner bears the burden if the sequential evaluation process proceeds to step five. Id.

1, Subpart P, Regulation No. 4.

5. The undersigned finds the claimant's allegations regarding her limitations are not totally credible for the reasons set forth in the body of the decision.

6. The claimant has the following residual functional capacity: lift/carry 20 pounds, stand/walk about six out of eight hours, sit about six out of eight hours, occasionally perform postural activities, and no frequent overhead reaching with her upper extremities consistent with a narrow range of light to sedentary work.

7. The claimant's past relevant work as a film scanner, courtesy clerk, and package receiver did not require the performance of work-related activities precluded by her residual functional capacity (20 CFR §§ 404.1565 and 416.965).

8. The claimant's medically determinable impairments do not prevent the claimant from performing her past relevant work.

9. The claimant was not under a "disability" as defined in the Social Security Act, at any time through the date of the decision (20 CFR §§ 404.1520(f) and 416.920(f)).

(Tr. at 18-19.)

ISSUES PRESENTED

Plaintiff has raised the following issues: A. Whether the ALJ Erred in Rejecting the Opinions of Plaintiff's Treating Physician and the Social Security Administration's Consultative Examiner; B. Whether the ALJ Properly Assessed Plaintiff's Credibility; and C. Whether the ALJ Erred in Finding Plaintiff Capable of Performing Past Relevant Work.

LEGAL STANDARDS

The court reviews the Commissioner's decision to determine whether (1) it is based on proper legal standards pursuant to 42 U.S.C. § 405(g), and (2) substantial evidence in the record as a whole supports it. Tackett v. Apfel, 180 F.3d 1094, 1097 (9th Cir.1999). Substantial evidence is more than a mere scintilla, but less than a preponderance. Saelee v. Chater, 94 F.3d 520, 521 (9th Cir. 1996). "'It means such evidence as a reasonable mind might

3

accept as adequate to support a conclusion.'" Richardson v. Perales, 402 U.S. 389, 402, 91 S. Ct. 1420 (1971), quoting Consolidated Edison Co. v. N.L.R.B., 305 U.S. 197, 229, 59 S. Ct. 206 (1938). "The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and resolving ambiguities." Edlund v. Massanari, 253 F.3d 1152, 1156 (9th Cir. 2001) (citations omitted). "Where the evidence is susceptible to more than one rational interpretation, one of which supports the ALJ's decision, the ALJ's conclusion must be upheld." Thomas v. Barnhart, 278 F.3d 947, 954 (9th Cir. 2002).

ANALYSIS

A. The ALJ Properly Evaluated the Opinions of Plaintiff's Treating Physician and the Social Security Administration's Consultative Examiner

Plaintiff contends that the opinions of her treating physician, Dr. Klistoff, and that of the Social Security physician, Dr. Borges, were improperly rejected by the ALJ.

The weight given to medical opinions depends in part on whether they are proffered by treating, examining, or non-examining professionals. Holohan v. Massanari, 246 F.3d 1195, 1201 (9th Cir. 2001); Lester v. Chater, 81 F.3d 821, 830 (9th Cir. 1995).[3] Ordinarily, more weight is given to the opinion of a treating professional, who has a greater opportunity to know and observe the patient as an individual. Id.; Smolen v. Chater, 80 F.3d 1273, 1285 (9th Cir. 1996).

To evaluate whether an ALJ properly rejected a medical opinion, in addition to considering its source, the court considers whether (1) contradictory opinions are in the record; and (2) clinical findings support the opinions. An ALJ may reject an *uncontradicted* opinion of

---

[3] The regulations differentiate between opinions from "acceptable medical sources" and "other sources." See 20 C.F.R. §§ 404.1513 (a),(e); 416.913 (a), (e). For example, licensed psychologists are considered "acceptable medical sources," and social workers are considered "other sources." Id. Medical opinions from "acceptable medical sources," have the same status when assessing weight. See 20 C.F.R. §§ 404.1527 (a)(2), (d); 416.927 (a)(2), (d). No specific regulations exist for weighing opinions from "other sources." Opinions from "other sources" accordingly are given less weight than opinions from "acceptable medical sources."

4

a treating or examining medical professional only for *"clear and convincing"* reasons. <u>Lester</u>, 81 F.3d at 831. In contrast, a *contradicted* opinion of a treating or examining professional may be rejected for *"specific and legitimate"* reasons. <u>Lester</u>, 81 F.3d at 830. While a treating professional's opinion generally is accorded superior weight, if it is contradicted by a supported examining professional's opinion (supported by different independent clinical findings), the ALJ may resolve the conflict. <u>Andrews v. Shalala</u>, 53 F.3d 1035, 1041 (9th Cir. 1995) (citing <u>Magallanes v. Bowen</u>, 881 F.2d 747, 751 (9th Cir. 1989)). The regulations require the ALJ to weigh the contradicted treating physician opinion, <u>Edlund v. Massanari</u>, 253 F.3d 1152 (9th Cir. 2001),[4] except that the ALJ in any event need not give it any weight if it is conclusory and supported by minimal clinical findings. <u>Meanel v. Apfel</u>, 172 F.3d 1111, 1113 (9th Cir.1999) (treating physician's conclusory, minimally supported opinion rejected); <u>see also</u> <u>Magallanes</u>, 881 F.2d at 751. The opinion of a non-examining professional, without other evidence, is insufficient to reject the opinion of a treating or examining professional. <u>Lester</u>, 81 F.3d at 831.

The ALJ chose to give weight to Dr. McIntire, a neurological consultant, and Dr. Borges, an osteopath, and rejected the opinion of Dr. Klistoff, plaintiff's treating physician. The ALJ explained that Dr. Klistoff's diagnosis of fibromyalgia was not supported by his treating records because plaintiff was not referred to a rheumatologist and there was no evidence of multiple tender points. (Tr. at 17.) The ALJ explained that Dr. Klistoff's records supported the functional limitations set forth by the other physicians and adopted by the ALJ, namely that plaintiff could lift or carry a maximum of twenty pounds, occasionally perform postural activities, and do no frequent overhead reaching. (<u>Id.</u>) According to the ALJ, his records indicated "entrapment neuropathy of the right anterior interosseous nerve and left-sided carpal

\\\\\

---

[4] The factors include: (1) length of the treatment relationship; (2) frequency of examination; (3) nature and extent of the treatment relationship; (4) supportability of diagnosis; (5) consistency; (6) specialization. 20 C.F.R. § 404.1527

1  tunnel syndrome with no suggestion of a myopathy, plexopathy or cervical radiculopathy." (Id.)
2  A March, 2003 x-ray indicated that the cervical spine was unremarkable. (Tr. at 135.)

3　　　　　Plaintiff takes issue with the ALJ's acknowledgment that fibromyalgia generally
4  has no objective findings, followed by the illogical statement that the objective findings
5  supported the claims of pain in the neck and arms only. Because fibromyalgia cases depend
6  mostly on subjective symptoms, and no objective tests can verify the existence of the condition,
7  they present difficult issues. Accordingly, the court has devoted extra scrutiny to the records of
8  plaintiff's treating physician to determine whether the ALJ's decision is factually and legally
9  supportable.

10　　　　　Fibromyalgia refers to "[a] group of common nonarticular disorders characterized
11  by achy pain, tenderness, and stiffness of muscles, areas of tendon insertions, and adjacent soft
12  tissue structures." The Merck Manual 481 (17th ed.1999). Although cutting edge studies are in
13  progress to establish physiological criteria, "The symptoms of fibromyalgia are entirely
14  subjective, and there are no laboratory tests to identify its presence or severity." Ward v. Apfel,
15  65 F. Supp. 2d 1208, 1213 (D. Kan.1999) (citing Sarchet v. Chater, 78 F.3d 305, 306 (7th
16  Cir.1996)). "The principal symptoms are 'pain all over,' fatigue, disturbed sleep, stiffness, and
17  ... multiple tender spots, more precisely 18 fixed locations on the body (and the rule of thumb is
18  that the patient must have at least 11 of them to be diagnosed as having fibromyalgia) that when
19  pressed firmly cause the patient to flinch. All these symptoms are easy to fake, although few
20  applicants for disability benefits may yet be aware of the specific locations that if palpated will
21  cause the patient who really has fibromyalgia to flinch .... Some people may have such a severe
22  case of fibromyalgia as to be totally disabled from working, but most do not and the question is
23  whether [the plaintiff] is one of the minority." Sarchet v. Chater, 78 F.3d 305, 306-07 (7th
24  Cir.1996) (citation omitted). See *Fibromyalgia Network*, *Diagnostic Criteria and Fibromyalgia*
25  *Basics*, www.fmnetnews.com; National Fibromyalgia Assn., *About Fibromyalgia*,
26  www.fmaware.org. A claimant's accounts of pain, especially where the subjective symptoms are

6

relevant to the medical diagnosis, must be carefully considered. Cf. Reddick v. Chater, 157 F.3d 715, 725-26 (9th Cir.1998) (discussing subjective complaints in context of diagnosis for chronic fatigue syndrome).

Dr. Klistoff's records on March 19, 2003 indicate that plaintiff had normal range of motion in the back, range of motion of the neck was 80% of normal, and deep tendon reflexes were normal. (Tr. at 136.) At this time, plaintiff was diagnosed with chronic back pain and fibrositis. (Id.) A nerve conduction study by Dr. Yassa, at Dr. Klistoff's referral, dated October 17, 2003, was abnormal, indicating "evidence of an entrapment neuropathy of the right anterior interosseous nerve and left sided carpal tunnel syndrome. No suggestion of a myopathy, plexopathy or cervical radiculopathy." (Tr. at 142.) There are very few other treatment notes in the record and none referring to fibromyalgia, other then the residual functional capacity questionnaire which lists fibromyalgia as one of the diagnoses. (Id. at 143.) This form concludes that plaintiff can sit, stand and walk for four hours in a day, sit for four hours, and stand for four hours. (Tr. at 146.) He thought plaintiff could occasionally lift less than ten pounds, and rarely lift ten pounds. (Tr. at 147.) Plaintiff could rarely look down, and occasionally turn the head and look up. She could occasionally stoop and crouch, but rarely twist or climb ladders and stairs. (Id.)

The ALJ was accurate in observing that Dr. Klistoff's notes and the records submitted fail to document that he ever conducted a trigger point exam, or obtained testing or information to evaluate plaintiff's condition by ruling out other explanations. (Id.) See Rollins v. Massanari, 261 F.3d 853, 855 (9th Cir. 2001) ( discussing fibromyalgia). The bare references to "fibromyalgia," without any evidence of evaluation or treatment therefor, (see e.g., Tr. at 143), do not warrant consideration.

Moreover, the ALJ was not required to credit the opinion of Dr. Klistoff that plaintiff was disabled. "A statement by any physician that the claimant is disabled or unable to work is a conclusion on the ultimate issue to be decided . . . and is not binding on the [ALJ] in

7

reaching his determination as to whether the claimant is disabled within the meaning of the [Act]." Murray v. Heckler, 722 F.2d 499 (9th Cir. 1983), (citing Burkhart v. Bowen, 856 F.2d 1335 (9th Cir. 1988)), 20 C.F.R. §§ 404.1527 and 404.927); accord, Magallanes v. Bowen, 881 F.2d 747, 750-51 (9th Cir. 1989).

In contrast to plaintiff's assertion that the ALJ fashioned his own RFC, the ALJ relied on the opinions of Drs. Borges and McIntire to make his findings regarding plaintiff's functional capacity. (Tr. at 16.) Dr. Borges, a consultative osteopath whom the ALJ did not reject but specifically accepted (Tr. at 16), found on February 12, 2004, that plaintiff could sit, stand and walk for one to two hours at a time, and for six to eight hours on a non-continuous basis. (Tr. at 152.) She could lift, carry, push and pull up to ten pounds. (Id.) She could occasionally do continuous bending, squatting, kneeling, and crawling. She could reach above the shoulders occasionally. (Id.) She could not climb. Plaintiff did not need an assistive device. (Id. at 153.) The opinion upon which the ALJ specifically relied was an earlier evaluation, dated January 27, 2003 which came to similar conclusions but limited plaintiff to lifting 25 pounds frequently, and stated that plaintiff could use her hands frequently. (Tr. at 126.) Dr. Borges based his findings on several radiological and medical records, as well as his exam. In addition to the October, 2003 EMG mentioned above, there was a thoracic spine film, dated April, 1999, which indicated mild spinal scoliosis and mild degenerative joint disease. (Id. at 148, 113.) A neck x-ray from October 24, 2003 showed that the cervical and thoracic spine were unremarkable. (Id., 121.)[5] At the visit, plaintiff was able to sit and walk around with no problem. (Id. at 149.) Dr. Borges concluded that plaintiff had "diffuse bilateral sternocleidomastoid tenderness to palpation along with paraspinal tenderness from approximately C4-T2. She also has diffuse spasms from approximately T10-L2 bilaterally. Remainder of spine is nontender with normal lordotic and kyphotic curves. No obvious gross scoliosis noted." (Tr.

---

[5] The x-ray itself is dated October 24, 2002, but Dr. Borges' report refers to an October 24, 2003 x-ray. (Tr. at 121, 148.)

8

at 151.) Plaintiff also had carpal tunnel syndrome in both hands, as supported by the October 2003 EMG in regard to the left side, and positive Tinel's and Phalen's signs on the right side. (Id. at 152.)

Dr. McIntire, a consulting neurologist, examined plaintiff on February 13, 2004, and reviewed her medical records. His diagnosis was "distant history of cervical/lumbar strain." (Tr. at 161.) There was full range of motion of the cervical and lumbar spine, and no objective findings which would suggest radiculopathy or myelopathy. (Id. at 161.) Neurological examination was normal other than nonphysiological and elaborated features. Plaintiff's gait was normal, requiring no assistive device. (Id. at 159.) Dr. McIntire would not limit plaintiff in sitting, standing, walking, lifting or carrying, and would not impose any other limitations. (Id. at 161.)

The ALJ was entitled to reduce plaintiff's lifting capacity to twenty pounds where Dr. McIntire did not restrict her lifting at all, and Dr. Borges' earlier report limited her to lifting a maximum of twenty-five pounds on a frequent basis. Any error by the ALJ in not specifically rejecting Dr. Borges more recent February, 2004 report which limited plaintiff to lifting ten pounds only, was harmless because one of plaintiff's past jobs was sedentary and did not require lifting more than ten pounds. Therefore, these more recent restrictions would still allow her to do this past work. An error which has no effect on the ultimate decision is harmless. See discussion Section C infra. Curry v. Sullivan, 925 F.2d 1127, 1121 (9th Cir. 1990).

The ALJ's treatment of the opinions of Dr. Klistoff and Dr. Borges was proper, and is supported by substantial evidence.

B. Whether the ALJ Properly Assessed Plaintiff's Credibility

Plaintiff asserts that the ALJ erred in finding her testimony not credible and in finding that her daily activities indicated she could work.

The ALJ determines whether a disability applicant is credible, and the court defers to the ALJ who used the proper process and provided proper reasons. See, e.g., Saelee v. Chater,

94 F.3d 520, 522 (9th Cir. 1995). If credibility is critical, the ALJ must make an explicit credibility finding. Albalos v. Sullivan, 907 F.2d 871, 873-74 (9th Cir. 1990); Rashad v. Sullivan, 903 F.2d 1229, 1231 (9th Cir. 1990) (requiring explicit credibility finding to be supported by "a specific, cogent reason for the disbelief").

In evaluating whether subjective complaints are credible, the ALJ should first consider objective medical evidence and then consider other factors. Bunnell v. Sullivan, 947 F.2d 341, 344 (9th Cir.1991) (en banc). The ALJ may not find subjective complaints incredible solely because objective medical evidence does not quantify them. Id. at 345-46. If the record contains objective medical evidence of an impairment possibly expected to cause pain, the ALJ then considers the nature of the alleged symptoms, including aggravating factors, medication, treatment, and functional restrictions. See id. at 345-47. The ALJ also may consider the applicant's: (1) reputation for truthfulness or prior inconsistent statements; (2) unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment; and (3) daily activities.[6] Smolen v. Chater, 80 F.3d 1273, 1284 (9th Cir. 1996); see generally SSR 96-7P, 61 FR 34483-01; SSR 95-5P, 60 FR 55406-01; SSR 88-13. Work records, physician and third party testimony about nature, severity, and effect of symptoms, and inconsistencies between testimony and conduct, may also be relevant. Light v. Social Security Administration, 119 F.3d 789, 792 (9th Cir. 1997). The ALJ may rely, in part, on his or her own observations, see Quang Van Han v. Bowen, 882 F.2d 1453, 1458 (9th Cir. 1989), which cannot substitute for medical diagnosis. Marcia v. Sullivan, 900 F.2d 172, 177, n.6 (9th Cir. 1990). Absent affirmative evidence demonstrating malingering, the reasons for rejecting applicant testimony
\\\\\

---

[6] Daily activities which consume a substantial part of an applicants day are relevant. "This court has repeatedly asserted that the mere fact that a plaintiff has carried on certain daily activities, such as grocery shopping, driving a car, or limited walking for exercise, does not in any way detract from her credibility as to her overall disability. One does not need to be utterly incapacitated in order to be disabled." Vertigan v. Halter, 260 F.3d 1044, 1049 (9th Cir. 2001) (quotation and citation omitted).

10

must be clear and convincing.  Morgan v. Commissioner of Social Sec. Admin., 169 F.3d 595, 599 (9th Cir. 1999).

In rejecting plaintiff's credibility, the ALJ noted the lack of treatment records between 2001 and 2003, despite plaintiff's allegation that she became disabled in November, 2001.  (Tr. at 17.)  The ALJ also referred to the inconsistencies between plaintiff's claim that her daughter does all the housework, and her separate statement that her daughter helps her, but that she does light housework, that she goes to the movies and shops.  (Id.)  Plaintiff also reported that she has 20 to 25 bad days per month where she cannot sit or stand but can only lie down; yet the ALJ noted that she did not report such severe symptoms to any physician.  The ALJ further analyzed plaintiff's credibility:

> No significant atrophy, neurological deficits, radicular pain, weakness, reflex absence, or decreased sensation were reported. The claimant has not participated in the treatment normally associated with a severe pain syndrome.  She has not had physical therapy, referral to a pain clinic, cervical brace, wrist brace, assistive device for ambulation, etc.  Further, she betrayed no evidence of more than mild pain or discomfort while testifying at the hearing.  While the hearing was short-lived and cannot be considered a conclusive indicator of the claimant's overall level of pain on a day-to-day basis, the apparent lack of discomfort during the hearing is given some slight weight in reaching the conclusion regarding the credibility of the claimant's allegations and the claimant's residual functional capacity.  Dr. Klistoff noted that her headaches are relieved with medication.  Finally, the type, dosage, and side effects of medication employed to treat her impairment would not preclude her from performing work at a sedentary to narrow range of light exertion.  On the basis of the foregoing, the undersigned concludes her allegations of limitations precluding sedentary to a narrow range of light work are unsupported by the evidence.

(Tr. at 17-18.)

Plaintiff contends that the record indicates no evidence of malingering, but to the contrary, Dr. Borges specifically noted that plaintiff "did provide an honest effort."  Although the record does reflect this statement, (tr. at 152), it primarily supports the ALJ's findings.  For example, Dr. McIntire noted on exam that "there is embellishment on strength testing with

11

frequent giveaway. There is no pain associated with the give ways." (Tr. at 160.) Further, there is a dearth of treatment records which would suggest that plaintiff's problems are not as severe as she alleges. Dr. Klistoff's records comprise only about nine pages in the record. As plaintiff's treating physician for at least eight or nine months, it is surprising that plaintiff's treatment was not on par with the level of pain and problems alleged. Furthermore, if this physician only treated plaintiff beginning in February, 2003, yet her problems began in 2001, it is odd that there are no treating records in the file for the time period preceding Dr. Klistoff's treatment. It is true that plaintiff's records include chiropractic treatment beginning in 1999; however, these records indicate large gaps in time when plaintiff appears to have received no therapy. Between April 24, 2000 and December 15, 2001, and from January 2, 2002 to September 18, 2002, there is no record of treatment. (Tr. at 107-10.) Further, there is no record of visits by plaintiff after March 12, 2003. (Id. at 107.)

Plaintiff's pain medication controlled her symptoms according to her treating physician, and was not the type prescribed for severe pain. (Tr. at 144.) She was taking Naprosyn and Darvocet  Darvocet is prescribed for only mild to moderate pain. Physicians' Desk Reference 1567 (53d ed. 1999). Naprosyn is prescribed for arthritis. Id. at 2673. (Tr. at 137.)

The ALJ also correctly summarized the disparity in plaintiff's statements regarding her daily activities. Plaintiff's daily activities questionnaire, dated December 20, 2002, states that she can only walk a block, she can lift groceries every other week, but cannot lift any weight, dusts, vacuums, drives a car one and a half hours per day or every other day at most, and goes to the movies. (Tr. at 67-69.) Her later questionnaire, dated March 27, 2003, also states that plaintiff carries groceries from the car to her house, does light housekeeping such as washing dishes and counter top, dusting, folding laundry, with rests in between. (Id. at 78-80.) Plaintiff stated she drives a car for up to thirty minutes at a time, and goes to the grocery store and doctors' appointments. (Id.) At the administrative hearing, plaintiff testified that her daughter

12

does the housework, and the two of them do grocery shopping together so her daughter can lift the items. (Id. at 188.) Plaintiff testified that she helps her daughter do the cooking. (Id.) In a reconsideration disability report, dated February 27, 2003, plaintiff reported that her daughter cleans, does laundry, and cooking, and that much of the time plaintiff is not able to accomplish activities. (Id. at 76.) Plaintiff told Dr. Borges and Dr. McIntire that she does some housework, and can lift a gallon of milk. (Id. at 123, 158.) Based on these reports of varying levels of activity, the ALJ was entitled to question plaintiff's credibility. Substantial evidence supports his determination in this regard.

      C.  Past Relevant Work

Finally, plaintiff contends that the ALJ erred in finding that plaintiff could do her past work as a film scanner, courtesy clerk, and package receiver. The ALJ found that plaintiff could do between a narrow range of light work and sedentary work. He found her functional limitations to include lifting and carrying up to twenty pounds occasionally, standing and walking for six hours, sitting for six hours, occasionally performing postural activities, and no frequent overhead reaching with the upper extremities. (Tr. at 16.)

Plaintiff's own description of her past jobs indicated that film scanner involved sitting at a computer, and scanning documents from microfilm to a computer screen. (Tr. at 63.) It required her to sit for six hours a day, and reach for one hour a day. There was no lifting involved. (Id.) A vocational worksheet completed by a state agency examiner, as described to her by plaintiff, indicated that plaintiff could perform this job based on her residual functional capacity. (Id. at 84.)

Plaintiff also described her past work as courtesy clerk which involved packing customers' groceries at the check out line, loading them into the carts, and pushing the cart outside to the cars. (Id. at 64.) It involved standing, walking, stooping and handling. She lifted ten pounds at most, and frequently lifted less than ten pounds. (Id.) The past work of package receiver also involved standing, walking, handling objects, lifting up to twenty pounds, and

13

frequently lifting less than ten pounds. (Id. at 65.) Plaintiff would lift packages off a table and set them on the floor behind her. (Id.)

All three jobs fit within the range of work which the ALJ found plaintiff could do. Since the range of light work was limited by the ALJ as set forth above, the jobs of courtesy clerk and package receiver fit within those limitations. The job of film scanner fits within the sedentary work description.

"Sedentary work" is defined by 20 C.F.R. § 404.1567(a)(2005) as follows:

> Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met. "Occasionally" means occurring from very little up to one-third of the time, and would generally total no more than about 2 hours of an 8-hour workday. Sitting would generally total about 6 hours of an 8-hour workday. SSR 96-9p., 61 Fed. Reg. 34,478 (1996); SSR 83-10 (1983); Ferraris v. Heckler, 728 F.2d 582, 587 (2nd Cir. 1984) (upholding SSR 83-10). Social Security Rulings are final opinions and policy of the Social Security Administration, and as such are binding on ALJs. Paulson v. Bowen, 836 F.2d 1249, 1252 n. 2 (9th Cir.1988). The claimant bears the burden of proof at this stage of the sequential analysis. Bowen v. Yuckert, 482 U.S. at 146, n. 5,107 S. Ct. 2287.

Plaintiff objects to the description of plaintiff's past work by plaintiff herself, and contends that because the ALJ did not provide the DOT[7] codes for any of these jobs, it is

---

[7] The United States Dept. of Labor, Employment & Training Admin., Dictionary of Occupational Titles (4th ed. 1991), ("DOT") is routinely relied on by the SSA "in determining the skill level of a claimant's past work, and in evaluating whether the claimant is able to perform other work in the national economy." Terry v. Sullivan, 903 F.2d 1273, 1276 (9th Cir. 1990). The DOT classifies jobs by their exertional and skill requirements. It is used by the SSA

impossible to determine the skills required to perform them.  Plaintiff is informed that "The ALJ was entitled to rely on plaintiff's own statements to determine the requirements of her past work." Khuu v. Chater, 12 F. Supp. 2d 1028, 1031, n. 6 (C.D. Cal. 1997).  Social Security Ruling 82-62 states: "[t]he claimant is the primary source for vocational documentation, and statements by the claimant regarding past work are generally sufficient for determining the skill level; exertional demands and nonexertional demands of such work."  1982 WL 31386 at *3.

Plaintiff bears the burden of proving she suffers from a physical or mental impairment that makes her unable to perform "past relevant work." Andrews v. Shalala, 53 F.3d 1035, 1040 (9th Cir.1995).  Plaintiff cannot merely show she is incapable of performing the particular job she once did; she must prove she cannot return to the same type of work. Villa v. Heckler, 797 F.2d 794, 798 (9th Cir.1986).  In determining whether a disability applicant can perform past work, the Commissioner may consider work as it was actually performed, or as it is normally performed in the national economy.  The ALJ determines the demands of a past job and compares the demands to current RFC.  Villa, 797 F.2d at 798.

The ALJ found plaintiff's past jobs to be limited to lifting between ten and twenty pounds, and requiring no frequent overhead reaching and only occasional postural activities.  It was not necessary for the Commissioner to call a vocational expert because the production burden never shifted to the Commissioner. See Miller v. Heckler, 770 F.2d 845, 850 (9th Cir.1985).  Moreover, the ALJ need not consider the Dictionary of Occupational Titles if he finds the plaintiff able to perform her past relevant work.  The Ninth Circuit has stated, "[t]he ALJ uses the Dictionary only if he determines that the plaintiff cannot perform her past relevant work." Salvador v. Sullivan, 917 F.2d 13, 15 (9th Cir. 1990).

\\\\\

---

to classify jobs as skilled, unskilled, or semiskilled.  (Id.)  Each job is assigned a number reflecting  how long it generally takes to learn the job, termed "specific vocational preparation" ("SVP") time.  (Id.)

Likewise, the ALJ was not required to call a VE based on plaintiff's claim of needing frequent unscheduled breaks or not being able to lift in excess of ten pounds. These limitations have already been properly rejected in Section A *supra*.[8] The ALJ may consider the testimony of a vocational expert to determine if plaintiff can do her past relevant work; however, the ALJ is not required to call such an expert at the fourth step. Matthews v. Shalala, 10 F.3d 678, 681 (9th Cir. 1993). See also Crane v. Shalala, 76 F.3d 251, 255 (9th Cir. 1996) (since ALJ found plaintiff could do his past work at step four, there was no need to call a vocational expert for step five).

This circuit has held that only if a nonexertional impairment is significant enough to limit plaintiff's work *in a certain category* must the ALJ resort to a vocational expert. Perimeter v. Heckler, 765 F.2d 870, 872 (9th Cir. 1985) (finding lack of evidence of ability to perform specific jobs; Blackall v. Heckler, 721 F.2d 1179, 1181 (9th Cir. 1983)). See also Ode v. Heckler, 707 F.2d 439 (9th Cir. 1983) (requiring significant limitation on exertional abilities in order to depart from the grids). In this case, plaintiff has no nonexertional impairments and the analysis properly ends at step four. Consequently, a vocational expert was not required. Plaintiff has also failed to show that she could not return to any of her previous jobs, and therefore the burden of proof remained with her.

Even assuming arguendo that the ALJ erred in finding that plaintiff's residual functional capacity allowed her to do her past relevant work, such an error would have been harmless because plaintiff would in any event have been able to perform at least sedentary, unskilled work, which would have directed a finding of not disabled under the Medical-Vocational Guidelines. An error which has no effect on the ultimate decision is harmless. Curry v. Sullivan, 925 F.2d 1127, 1121 (9th Cir. 1990).

---

[8] In regard to plaintiff's claim of manipulative limitations based on carpal tunnel syndrome, the physicians upon whom the ALJ relied did not find her to be restricted in movement on this basis.

CONCLUSION

Accordingly, IT IS ORDERED that plaintiff's Motion for Summary Judgment or Remand is denied, the Commissioner's Cross Motion for Summary Judgment is granted, and judgment is entered for the Commissioner.

DATED: 1/31/06

/s/ Gregory G. Hollows

_____
GREGORY G. HOLLOWS
U.S. MAGISTRATE JUDGE

GGH/076
Glover2288.ss.wpd